## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **NILDA RIVERA CRUZ**,<br>Plaintiff,<br><br>v.<br><br>**HEWITT ASSOCIATES CARIBE, INC.**, *et al.*,<br>Defendants. | Civil No. 15–1454 (PAD/BJM) |

## REPORT AND RECOMMENDATION

Alleging harassment and retaliation, Nilda Rivera Cruz ("Rivera") brought this action against Hewitt Associates Caribe, Inc. ("Hewitt"), Aon Risk Solutions of Puerto Rico, Inc. ("ARS") under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; Puerto Rico Law 100 ("Law 100"), P.R. Laws Ann. tit. 29, § 146; Puerto Rico Law 80 ("Law 80"), P.R. Laws Ann. tit. 29, § 185; Puerto Rico Law 379 ("Law 379"), P.R. Laws Ann. tit. 29, § 271; Puerto Rico's Constitution, Art. II, §§ 1, 3, 8, 16; Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. Laws Ann. tit. 31, § 5141; and Puerto Rico's breach of contract statutes. Docket No. 1 ("Compl.") at 1–2. Hewitt moved for summary judgment, Docket Nos. 107, 127, and Rivera opposed. Docket Nos. 117, 132. Judge Delgado-Hernandez referred the motion for summary judgment to me for report and recommendation. Docket No. 134.

For the reasons set forth below, the motion for summary judgment should be **GRANTED IN PART AND DENIED IN PART**.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party."

---

[1] As I already separately recommended that ARS's motion for summary judgment be granted, this report and recommendation will only address Rivera's claims against Hewitt. Docket No. 136.

*Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## BACKGROUND

Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the district court may "forgive" a violation of Local Rule 56, litigants ignore the rule "at their peril." *See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

Rivera argues that Hewitt's statement of uncontested facts should not be considered because its original statement contained repeated errors in the record citations. *See* Docket No.

132. Although Rivera is correct that Hewitt repeatedly violated the rule by citing to pages and paragraphs that did not support its facts or did not exist, Hewitt has since provided the correct record citations. See Docket No. 128–1. As such, I chose to consider the statement of facts of both parties.

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56 submissions: the parties' joint statement of uncontested facts, Docket No. 98 ("APSUF"), Rivera's statement of uncontested facts, Docket No. 116–2 ("PSUF"), Hewitt's response to Rivera's statement of uncontested facts, Docket No. 128 ("DRSUF"), Hewitt's statement of uncontested facts, Docket No. 99 ("DSUF"), Rivera's response to Hewitt's statement of uncontested facts, Docket No. 116–1 ("PRSUF"), and Hewitt's reply to Rivera's response to Hewitt's statement of uncontested facts, Docket No. 128–1 ("DRESUF").

Hewitt is a human resources consulting company that, among other things, is contracted by Home Depot to provide assistance to Home Depot employees at its call centers. APSUF ¶¶ 12–13. Home Depot employees call Hewitt's Call Service Center to speak with one of Hewitt's Customer Service Representatives regarding questions about or issues with their benefit, retirement, and disability plans through Home Depot. APSUF ¶¶ 13–14. Rivera began working for Hewitt in July 2013 as a Customer Service Representative in its San Juan Call Center. PSUF ¶ 8. She underwent six weeks of training and was then assigned to exclusively work on the Home Depot Account. APSUF ¶ 20. As a Customer Service Representative, Rivera's job was to assist and answer calls from English-speaking Home Depot employees. APSUF ¶ 27; Docket No. 117 at 5. When her six-month contract ended on January 29, 2014, she was offered a second contract that ran through March 31, 2014. APSUF ¶ 28. The new contract included a raise. APSUF ¶ 28. In March, Hewitt renewed Rivera's contract again through the end of April. DSUF ¶ X. On April 30, 2014, Hewitt terminated Rivera's employment. APSUF ¶ 32.

When Rivera began working at Hewitt, Livia Ramos was Rivera's Team Leader and Arisbel Castro was the Customer Service Team Manager for the Home Depot account. APSUF ¶ 24. On March 3, 2014, Ramos was promoted and took over from Castro as the Customer Service

Team Manager in charge of the Home Depot account. APSUF ¶¶ 23–24. Before becoming the Customer Service Team Manager, Ramos was not Rivera's supervisor in that she could not hire, fire, demote, or otherwise affect the terms and conditions of Rivera's employment. DSUF ¶ M.

Rivera is Puerto Rican. ASUF ¶ 17. Beginning on August 19, 2013 and continuing to the end of her employment with Hewitt, Home Depot employees made derogatory comments to Rivera while she was assisting them with their benefits-related concerns.[2]

Home Depot employees allegedly told Rivera over the phone: "You have a really heavy accent that I can't stand;" "I cannot stand your accent;" "I really hate your accent, fuck yourself and transfer this call;" "You will have to excuse me but, with your accent all I think is booze;" "Your stupid accent makes me sick;" and, "Do you really speak and understand English? I don't think so, you sound stupid and unaware of my situation." Others, when told that Rivera was in Puerto Rico said, "You aliens are everywhere;" "Would your tiny Latin brain understand my problem?;" "You people are used to the food stamps and do not understand how working people pay their bills. You will never understand us. I want you to transfer this fucking phone call immediately to a USA based CSR, so I can explain and they will understand my situation;" "Your stupid laws and procedures in Puerto Rico do not apply to us in the USA; transfer this call immediately to a supervisor so I can tell them to try, within your limited capacity, to train you people from Puerto Rico better for this kind of situation;" and, "No wonder you cannot help me, you people don't have enough brain space to learn new tricks." PSUF ¶¶ 12–14. Rivera was also allegedly asked by Home Depot employees if she was "on drugs or drunk like all of you." PSUF ¶ 12.

One of Rivera's co-worker stated that a Home Depot employee told him, in reference to Rivera, "I didn't know if she was from the states, her voice was different so, I decided to request for another agent." PRSUF ¶ MM. Two of Rivera's coworkers explained that Home Depot employees would say to them, "where are you guys from?" "You're not from the States." "Can I

---

[2] This is contested, as Hewitt alleges that the Home Depot employees never made harassing or derogatory comments to Rivera. Docket No. 107 at 13.

talk with someone from the States?" "Someone who knows English" "I want somebody from America." Docket No. 107 at 5–6.

After a Home Depot employee would make a derogatory comment, Rivera would "express that she was 'sorry.'" DSUF ¶ LL. At the end of the call, she would generally keep working and answering calls from other Home Depot employees. DSUF ¶ PP. Rivera does not remember the timing or dates of these comments, other than that she was "constantly subjected" to them. Docket No. 127 at 4; PSUF ¶ 16; DSUF ¶ QQ.

Rivera allegedly reported the offending comments to Ramos over five times, reporting "on so many occasions that she lost count as to the number of times." PSUF ¶ 16. Ramos told Rivera "don't take it personally . . . If you don't take it personally, you avoid confrontations, you transfer the call and, and, and that's it. That's what I did and what I did later when situations like that came up." Docket No. 101–2 at 131. Rivera would generally speak to Ramos about the comments on her way to pick up the key to the restroom as opposed to making an independent trip. Docket No. 107 at 13. Rivera did not report any of the comments to Ramos after Ramos became the Customer Service Team Manager in March. DRSUF ¶ 16. Rivera did not report the conduct using Hewitt's anti-harassment policy. Docket No. 107 at 16–18.

On January 30, 2014, Castro sent an email to the Customer Service Representatives for Home Depot, including Rivera. Docket No. 103–1; DSUF ¶ R. In her email, Castro wrote,

> I have heard a few calls where Home Depot employees have asked where is the Call Center located, and as soon as we say (you in this case) San Juan or Puerto Rico they go into paranoid crazy mode. We want to minimize that bad experience to you as I know, there is still a few people that are not that educated in history and this can be daunting for both, the CSR and the customer. . . . We are not here to have that type of confrontation.

Docket No. 103–1. In the same email, Castro told the Customer Services Representatives to, in the future, tell Home Depot employees that they are "located within the US," or specifically in "Charlotte, NC," if they are ever asked where the Call Center is located. *Id.*

Why Castro sent the email is contested: Hewitt alleges it was "to address concerns raised by The Home Depot CSRs regarding callers requesting their calls to be transferred to the mainland

United States," whereas Rivera alleges it was sent "in response to Rivera's and other Customer Service Representatives (CSR's) national origin discrimination grievances involving conduct perpetrated by the Home Depot employees." DSUF ¶ R; PRSUF ¶ R.

The person with overall responsibility for Hewitt's San Juan Call Center was Carlos Lopez, Hewitt's Customer Service Manager. APSUF ¶ 22. He knew about Rivera's performance while she worked at Hewitt and counseled her on her job performance. DRSUF ¶ 24. On April 28, 2014, Lopez met with the Customer Service Representatives on the Home Depot account. APSUF ¶ 31. During that meeting, he allegedly told them that he wanted "young, new blood, someone who would vigorously run with everything he wanted to introduce and all of the, the goals that he had set." Docket No. 101–2 at 176, 182; PSUF ¶ 25. Rivera was one of Hewitt's older Customer Service Representatives on the Home Depot account; the majority were under 40 whereas Rivera was 57 years old. DRSUF ¶ 28; APSUF ¶ 34.

Rivera's job performance between the beginning of her employment and the end of March is disputed. Rivera alleges that until March 25, 2014, she had never received a "coaching package," "evaluation" or "Personalized Care Guide." PSUF ¶ 22. She also never had a one-on-one coaching during that time. PSUF ¶ 22. Conversely, Hewitt argues that it gave her evaluations and coaching packages starting on September 17, 2013 and continuing throughout her employment because her "performance was subpar." DSUF ¶¶ X, EE. It is uncontested that on April 1, 2014, Ramos told Rivera that "they were going to put her on a personal improvement plan." PRSUF ¶ Y.  It is also uncontested that in April 2014, Angel Rivera, a trainer who evaluated Rivera's work, conducted three coaching sessions with Rivera. APSUF ¶ 18.

Hewitt contends that Rivera was terminated because her "performance did not improve." Docket No. 107 at 3. Hewitt also alleges that Ramos, in consultation with Castro, made the decision to terminate Rivera's employment. DRSUF ¶ 23.

After Hewitt decided to terminate Rivera, Rivera met in Hewitt's conference room with Hewitt's human resources staff to carry out her termination process. APSUF ¶ 33. While Rivera was in the conference room, Hewitt's employees opened the drawers of Rivera's desk, removed

her purse, opened it, and transferred Rivera's personal items from her desk to her purse. DRSUF ¶ 27. They then brought the purse to Rivera. DRSUF ¶ 27. The search and retrieval was done without Rivera's consent. PSUF ¶ 27; DRSUF ¶ 27. Rivera explained that when she arrived at work on her last day, she removed her "cellular, cigarette carrier and lighter, car keys, wallet, lipstick, pressed powder and female pads . . . [and] a hard cover folder with personal documents (bank statements, collection letters, personal notes, etc.)[,]" placed them in the drawers of her desk, and placed her purse in a separate desk drawer. DRSUF ¶ 27.

After Rivera's termination, Hewitt hired Rosamarie Perea (age 31) on August 15, 2014 and Gianfranco Prieto (age 24) on May 30, 2014. PSUF ¶ 28; DRSUF ¶ 28.

## DISCUSSION

Hewitt contends that summary judgment is appropriate as to all of Rivera's claims whereas Rivera maintains that summary judgment is improper as to all her claims because they are riddled with genuine disputes of material fact. Docket Nos. 107, 117, 127, 132. As I already recommended that Rivera's claims against ARS be dismissed because ARS was not Rivera's employer, I will only conduct the subsequent analysis of Rivera's employment discrimination claims with regard to Hewitt's employment of Rivera. *See* Docket No. 136.

## II.    TITLE VII

Rivera alleges that she was subjected to a a hostile work environment and retaliation because of her national origin. Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin[.]" 42 U.S.C. § 2000e-2(a)(1); *Kosereis v. Rhode Island*, 331 F.3d 207, 211 (1st Cir. 2003) (addressing Title VII hostile work environment claim based on national origin).

### A.    Hostile Work Environment

To establish a hostile work environment claim, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon her national origin; (4) the harassment was sufficiently severe or pervasive so as

to alter the conditions of plaintiff's employment and create an abusive work environment; (5) the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) some basis for employer liability has been established. *O'Rourke*, 235 F.3d at 728. "This is not a 'mathematically precise test,' and whether an environment is 'hostile' or 'abusive' is determined by looking at all the circumstances." *Aponte-Rivera v. DHL Sols. (USA), Inc.*, 650 F.3d 803, 808 (1st Cir. 2011) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22–23 (1993)).

Hewitt argues that the conduct Rivera alleges violated Title VII was not harassment, was not based on her national origin, and was not subjectively offense. Docket No. 107. It also argues that there is no basis for employer liability. Docket No. 107 at 15–18.

### 1.    *Member of a Protected Class*

Rivera is Puerto Rican. ASUF ¶ 17. "Being Puerto Rican sufficiently demonstrates membership in a protected class for national origin discrimination." *Saliceti-Valdespino v. Wyndham Vacation Ownership*, No. 12-CV-1325 (GAG), 2013 WL 5947140, at *6 (D.P.R. Nov. 6, 2013) (citing *Zayas-Ortiz v. Becton Dickinson Caribe, Ltd.,* 878 F. Supp. 2d 351, 355 (D.P.R. 2012)).

### 2.    *Unwelcome Harassment Based on National Origin*

Here, Rivera complains that she was subjected to frequent comments by Home Depot employees regarding her national origin. These included comments about her accent. It is uncontested that harassment based on someone's accent is a form of national origin discrimination. Docket No. 107 at 8; *Fragante v. City & Cnty. of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989) ("Accent and national origin are obviously inextricably intertwined[.]"). Rivera stated that while answering calls, Home Depot employees told her: "You have a really heavy accent that I can't stand;" "I cannot stand your accent;" "I really hate your accent, fuck yourself and transfer this call;" "You will have to excuse me but, with your accent all I think is booze;" "Your stupid accent makes me sick;" and, "Do you really speak and understand English? I don't think so, you sound stupid and unaware of my situation." Others, when told that Rivera was in Puerto Rico said, "You

aliens are everywhere;" "Would your tiny Latin brain understand my problem?;" "You people are used to the food stamps and do not understand how working people pay their bills. You will never understand us. I want you to transfer this fucking phone call immediately to a USA based CSR, so I can explain and they will understand my situation;" "Your stupid laws and procedures in Puerto Rico do not apply to us in the USA; transfer this call immediately to a supervisor so I can tell them to try, within your limited capacity, to train you people from Puerto Rico better for this kind of situation;" and, "No wonder you cannot help me, you people don't have enough brain space to learn new tricks." PSUF ¶¶ 12–14.

"All of those references are to nothing but [Rivera]'s national origin and" accent. *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 204 (6th Cir. 1993) (the district court erred in not allowing the jury to hear the plaintiff's national origin hostile work environment claim). The repeated and direct references to Rivera's accent and identity as a Puerto Rican would allow a reasonable jury to find that these comments were based on her national origin. This is not a case of simple teasing or offhand comments but rather one where, when viewing the facts in the light most favorable to the plaintiff, Rivera was subjected to repeated, deeply personal, and derogatory statements based on her national origin. *See* PSUF ¶¶ 12–13 (Rivera was told she had a "tiny Latin brain;" called an "alien;" asked if she was "on drugs or drunk like all of you;" and told "[y]ou people are used to the food stamps and do not understand how working people pay their bills."); *Galdamez v. Potter*, 415 F.3d 1015, 1023–24 (9th Cir. 2005) (plaintiff was subjected to national origin-based harassment where "[s]everal customers, including the mayor, expressed displeasure with having a Hispanic postmaster or criticized her accented English. One local newspaper referred to Galdamez's 'thick accent from her native Honduras' in explaining that she had not 'made friends in some quarters'").

Hewitt argues that these comments by Home Depot employees should not be admitted as evidence because they will have an "unfair prejudicial effect and danger of creating confusion on the jury." Docket No. 127 at 4. When the First Circuit evaluated a plaintiff's testimony recounting insults and taunting that she had faced, though—including testimony that a coworker shouted at

her that she "was the 'scum of the earth[,]'" that another said, referring to her, "'I smell a rat, do you smell a rat?'" and that a third "lamented that the parking enforcement officers' 'good' supervisor had been drummed out of office"—the court found such evidence admissible. *Noviello v. City of Boston*, 398 F.3d 76, 82, 84–85 (1st Cir. 2005). The taunts and insults by the Home Depot employees are similar to those in *Noviello*, and therefore I find that they should be considered as evidence. Moreover, Hewitt cites to *Colondres v. Potter*, No. 11-CV-1171 (D.P.R. August 21, 2012) as support for denying the Home Depot employees' statements into evidence because, like the plaintiff in *Colondres*, Rivera cannot remember the dates when the harassment occurred. *See* Docket No. 127 at 4; DSUF ¶ QQ. However, the court in *Colondres* did not find the plaintiff's testimony conclusory just because the plaintiff did not provide dates as Hewitt suggests but rather because the plaintiff could not remember when certain actions occurred; if they ever repeated, which is distinguishable from the case at hand; and also could not explain how the co-worker had been offensive, which is also distinguishable from the case at hand. *See Colondres*, No. 11-CV-1171, at *12 ("Plaintiff mentions the lustful staring and the insinuated sexual advance briefly, but provides no details such as when these incidents occurred, whether they repeated, or how Layme 'insinuate[d]' her sexual desires." (internal citation omitted)). Consequently, Rivera's testimony as to the Home Depot employees' statements should be considered as evidence of harassment.

Additionally, the email sent by Castro shows that Hewitt, at least at one point, also believed that Home Depot employees were making comments directly related to national origin. *See* Docket No. 103–1 ("Home Depot employees have asked where is the Call Center located, and as soon as we say (you in this case) San Juan or Puerto Rico they go into paranoid crazy mode."). This evidence, which shows that Hewitt believed that Home Depot employees were acting "paranoid" and "crazy to the twelve Customer Service Representatives on the Home Depot account, certainly increases the likelihood that Rivera also experienced such "crazy" behavior. Furthermore, two of Rivera's coworkers stated that Home Depot employees did not want to speak with them when they said that they were based in Puerto Rico, questioned their English abilities, and asked to speak to "someone from America." *See* Docket No. 107 at 5–6. ("Home Depot employees would request

transfer to an American representative after knowing they were located in Puerto Rico . . . [stating] 'where are you guys from?' 'You're not from the States.' 'Can I talk with someone from the States?" "Someone who knows English' . . . 'I want somebody from America.'"). One co-worker stated that a Home Depot employee told him, in reference to Rivera, "I didn't know if she was from the states, her voice was different so, I decided to request for another agent." PRSUF ¶ MM. A reasonable jury could find from this evidence that Rivera was harassed because of her national origin.

### 3.    *Severe or Pervasive*

To assess if harassment based on national origin was severe or pervasive, "[r]elevant factors may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance . . . whether it unreasonably interferes with an employee's work performance[, and] . . .  psychological harm" although  "no single factor is required." *Aponte-Rivera*, 650 F.3d at 808 (quoting *Harris,* 510 U.S. at 22–23). It is important to appreciate, though, that the "highly fact-specific nature of hostile environment claims tends to make it difficult to draw meaningful contrasts between one case and another for purposes of distinguishing between sufficiently and insufficiently abusive behavior." *Billings v. Town of Grafton*, 515 F.3d 39, 49 (1st Cir. 2008). Accordingly, "'[s]ubject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (quoting *Gorski v. N.H. Dep't of Corrections*, 290 F. 3d 466, 474 (1st Cir. 2002)).

While courts have found that "two racial slurs" are insufficiently severe, *Bolden v. PRC Inc.,* 43 *F.*3d 545, 551 (10th Cir. 1994), "repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident." *King v. Bd. of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir. 1990);  *see  Amirmokri v. Baltimore Gas & Elec. Co.,* 60 *F.*3d 1126, 1131 (4th Cir.  1995)  (there was a severe or pervasive hostile work environment where "co-workers abused him almost daily,

calling him names like "the local terrorist," a "camel jockey" and "the Emir of Waldorf"). Hewitt mistakenly suggests that the comments must be "sufficiently frequent and severe," but the plain language of the First Circuit's test states that the harassment must be severe or pervasive, not both. *See* Docket No. 107 at 13.

Rivera alleged that there were more than two isolated incidents of harassment as she was "constantly subjected" to harassing comments, but she also did not suggest that they occurred daily. PSUF ¶ 8; APSUF ¶ 32. And, other than the first incident on August 19, 2013, Rivera cannot identify when the comments at issue were made. PSUF ¶¶ 11. 17. Therefore, it is unlikely that she can show that she was subjected to pervasive harassment. Nonetheless, she has a better case for showing that the comments were severe given their intimidating nature and the level of ridicule. *See* PSUF ¶ 12 ("I really hate your accent, fuck yourself and transfer this call;" "Your stupid accent makes me sick."); *Saliceti-Valdespino*, No. 12-CV-1325, at *7 ("Severe *or* pervasive discriminatory remarks, ridicule, and intimidation fall at the other end of the continuum and may support a jury verdict finding a hostile work environment." (emphasis added) (citing *Noviello*, 398 F.3d at 92; *Marrero*, 304 F.3d at 19; *Figueroa Reyes v. Hosp. San Pablo del Este,* 389 F. Supp. 2d 205, 213 (D.P.R. 2005))). Rivera has presented a genuine dispute as to whether the comments by the Home Depot employees were severe; a reasonable jury could either find that the comments were sufficiently severe as to violate Title VII or that they did not rise to unlawful conduct. *See Godoy v. Maplehurst Bakeries, Inc.*, 747 F. Supp. 2d 298, 311 (D.P.R. 2010) ("An examination of the evidence as a whole shows that plaintiff's case appears to have a stronger footing on the severity than on the pervasiveness of the alleged harassment. Under these circumstances, the court finds there is a material issue of fact best left to the jury as to whether Ortiz's conduct created a 'workplace permeated with discriminatory intimidation.'").

Hewitt argues that these comments "were not discriminatory nor offensive per se" in part because "apparently she could not make herself understood by the callers." Docket No. 107 at 12. It also argues that the comments are ambiguous and "reasonably susceptible to an entirely benign interpretation." *Id*. However, given the strikingly derogatory nature of the comments and the fact

that the comments were made immediately after being told that Rivera was in Puerto Rico, a reasonable jury could find that these comments were not merely because the customer could not understand Rivera but rather constitute severe harassment based on her national origin. *See* PSUF ¶ 14 (Home Depot employee told Rivera, "Your stupid laws and procedures in Puerto Rico do not apply to us in the USA; transfer this call immediately to a supervisor so I can tell them to try, within your limited capacity, to train you people from Puerto Rico better for this kind of situation.). Moreover, Hewitt hired Rivera, certified that she successfully completed her six-week training, and renewed her contract twice. Hewitt's actions create a genuine dispute of material fact as to why Hewitt repeatedly chose to keep Rivera as a Customer Service Representative if she in fact could not make herself understood to the Home Depot employees. PSUF ¶ 8; APSUF ¶¶ 20, 28; DSUF ¶ X.

### 4.    *Subjectively and Objectively Offensive*

There is also a genuine dispute as to whether the comments by the Home Depot employees were subjectively and objectively offensive. Rivera reported the comments to Ramos over five times, allegedly reporting the comments to Ramos "on so many occasions that she lost count as to the number of times." PSUF ¶ 16. Such regular grievances could support a finding by a jury that Rivera found the comments subjectively offensive. Hewitt argues that the comments were not subjectively offensive. The evidence it points to include the fact that Rivera would keep working after she spoke with the allegedly harassing customers; that she testified that she would "express that she was 'sorry'" during these calls; and that she said that she complained to her team leader multiple times on the way to pick up the key to the restroom as opposed to making an independent trips. Docket No. 107 at 13; DSUF ¶¶ LL; PP. This evidence, though, does not show that there is no genuine dispute of material fact as to whether Rivera found the comments to be subjectively offensive. For instance, a jury could easily focus more on the fact that she complained to her team leader to show that the comments upset her rather than on the fact that she did so on the way to the bathroom. *See Saliceti-Valdespino*, No. 12-CV-1325 (GAG), at *9 (plaintiff sufficiently showed

comments were subjectively offensive through testifying in his deposition "how he subjectively interpreted Maley's comments as offensive").

Furthermore, for the same reasons that the harassment could be considered severe, it could also be found to be objectively offensive. "[W]hen viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find—although the evidence certainly does not compel it— that she was subjected to" subjectively and objectively offensive harassment. *De Los Santos Rojas v. Hosp. Español De Auxilio Mutuo de Puerto Rico, Inc.*, 85 F. Supp. 3d 615, 621 (D.P.R. 2015)

### 5. *Employer Liability*

The Supreme Court has held that an employer's liability for harassment may depend on the status of the harasser. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). Where the "harasser is a 'supervisor,'" the employer is strictly liable "[i]f the supervisor's harassment culminates in a tangible employment action." *Id.* "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.* "An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e); *Bodman v. Maine, Dep't of Health & Human Servs.*, 720 F. Supp. 2d 115, 122 n.7 (D. Me. 2010) (interpreting *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 854–55 (1st Cir. 1998) to hold that "'employers can be liable for a customer's unwanted sexual advances, if the employer ratifies or acquiesces in the customer's demands' under both a theory of *quid pro quo* and hostile work environment sexual harassment"); *Plaza-Torres v. Rey*, 376 F. Supp. 2d 171, 183 (D.P.R. 2005) ("[C]ustomer-on-employee harassment . . . has been expressly recognized by the First Circuit Court."). The same test applies to harassment based on national origin. *See Galdamez v. Potter*, 415 F3d 1015, 1024 (9th Cir. 2005) (affirming the "Postal Service's potential liability for harassment [of Postal Service employee] by customers and community members based on her race and national origin").

Rivera's evidence that Hewitt knew or should have known of the alleged harassment is that 1) Rivera complained to Angel Rivera and Ramos, and 2) Castro sent an email to the Customer Service Representatives on the Home Depot account discussing the "crazy" reactions of by Home Depot employees to finding out the Call Center was in Puerto Rico. Docket No. 117 at 14–16.

Rivera testified that, on multiple occasions, she told Angel Rivera and Ramos that she was experiencing harassing comments from Home Depot employees based on her identity as a Puerto Rican. PSUF ¶¶ 16–18. Hewitt in turn argues that neither Angel Rivera nor Ramos qualified as a supervisor and as such their knowledge cannot be imputed to Hewitt. *See* Docket No. 107 at 18. Therefore, the question is whether Angel Rivera or Ramos qualified as a supervisor such that Rivera's complaints to them could impose liability on Hewitt. "The key to determining supervisory status is the degree of authority possessed by the putative supervisor." *Noviello*, 398 F.3d at 95–96 (citations omitted). The mere title of supervisor is not as important as whether the employee is "entrusted with actual supervisory powers." *Id*. (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1033 (7th Cir. 1998)). "'[T]he essence of supervisory status is the authority to affect the terms and conditions of the victim's employment'" such that someone is a supervisor if they have some "modicum" of authority to "hire, fire, demote, promote, transfer, or discipline an employee." *Id.* (quoting *Parkins,* 163 F.3d at 1034).

Here, it is uncontested that Angel Rivera was a trainer who evaluated Rivera's work. APSUF ¶ 18. In April 2014, before she was terminated at the end of that month, Angel Rivera conducted three coaching sessions with Rivera. *Id*. Hewitt argues that Rivera was terminated because her performance did not improve, which was an assessment that may have been based at least in part on Angel Rivera's evaluations. Docket No. 107 at 3. Even assuming without deciding that Angel Rivera's evaluations formed part of the basis for the decision to terminate Rivera, though, Rivera has proffered no evidence that Angel Rivera himself had the authority to terminate Rivera. Without some modicum of authority to hire, fire, demote, promote, transfer, or discipline Rivera, Angel Rivera was not a supervisor such that his knowledge of Rivera's complaints could be imputed to Hewitt.

With regard to Ramos, both sides agree that before Rivera was fired, Ramos was her supervisor. APSUF ¶ 24. In fact, Hewitt stated that Ramos "decided to terminate Rivera's employment," clearly showing her authority to affect the terms and conditions of Rivera's employment. DRSUF ¶ 23. Although Hewitt points out that Ramos was not yet Rivera's supervisor when she complained to Ramos about the Home Depot employees' remarks, the question is whether Ramos, as a supervisor, knew that this harassment was occurring. Rivera testified that not only did she tell Ramos multiple times about the harassment, beginning two weeks after the first incident in August, but that Ramos told Rivera that she had experienced "situations like that" after Rivera disclosed the harassing comments to her. *See* Docket No. 101–2 at 131 (Ramos told Rivera, "don't take it personally . . . If you don't take it personally, you avoid confrontations, you transfer the call and, and, and that's it. That's what I did and what I did later when situations like that came up"). Considering the facts in the light most favorable to Rivera, the evidence shows that Ramos, who had the authority to fire Rivera, knew of the harassment because of Rivera's complaints and Ramos's own experiences.

The third individual who Rivera claims had knowledge of the harassment is Castro. On January 30, 2014, while the Team Manager of the Customer Service Representatives, Castro sent an email to the Customer Service Representatives for Home Depot, including Rivera. Docket No. 103–1; DSUF ¶ R. In her email, Castro wrote,

> I have heard a few calls where Home Depot employees have asked where is the Call Center located, and as soon as we say (you in this case) San Juan or Puerto Rico they go into paranoid crazy mode. We want to minimize that bad experience to you as I know, there is still a few people that are not that educated in history and this can be daunting for both, the CSR and the customer. . . . We are not here to have that type of confrontation.

Docket No. 103–1. In the same email, Castro told the Customer Services Representatives to, in the future, tell Home Depot employees that they are "located within the US," or specifically in "Charlotte, NC," if they are ever asked where the Call Center is located. *Id.*

Courts have found that "courts may impute constructive notice to an employer" when harassment occurs in the open such that the supervisor knew that it existed even if the plaintiff did

not alert the supervisor to its existence. *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999) ([e]mployees testified that much of the offensive graffiti was in restrooms commonly used by workers and supervisory foremen alike" such that the supervisors knew the racist graffiti existed even if the plaintiff had not directly reported it); *compare Theiss v. Walgreen Co.*, No. 16–3318, 2017 WL 5709423, at *3 (6th Cir. Mar. 1, 2017) (supervisor did not have constructive knowledge of co-workers' lewd gestures because although he "was regularly on the loading floor where the conduct was occurring" there was no evidence that the supervisor "saw the offensive conduct, was informed by someone who had, or was made aware of the conduct by another means"), *with Williamson v. City of Houston, Tex.*, 148 F.3d 462, 465 (5th Cir. 1998) (employer knew or should have known of the conduct where the supervisor had "observed it himself"); *Rosemond v. Stop & Shop Supermarket Co.*, 456 F. Supp. 2d 204, 217 (D. Mass. 2006) (constructive notice when supervisor saw a noose and did nothing about it before the plaintiff walked in even though the supervisor was not a high level official for whom the employer was vicariously liable. Notably, the court in *Jackson* did not require that the supervisor know that the plaintiff saw the offensive graffiti, just that it existed in an area that the plaintiff used. 191 F.3d at 663.

Here, when viewed in the light most favorable to Rivera, Castro's email reflects her personal knowledge as a supervisor that Home Depot employees were repeatedly making crazy and paranoid statements to the twelve-person team of Customer Service Representatives based on their being Puerto Rican.[3] Docket No. 103–1 ("*I have heard* a few calls where Home Depot employees have [gone] into paranoid crazy mode." (emphasis added)). Whether or not Castro knew that the comments rose to the level of national origin harassment and that they had been

---

[3] The parties contest whether Castro sent the email "to address concerns raised by The Home Depot CSRs regarding callers requesting their calls to be transferred to the mainland United States," as Hewitt alleges or whether it was sent "in response to Rivera's and other Customer Service Representatives (CSR's) national origin discrimination grievances involving conduct perpetrated by the Home Depot employees," as Rivera alleges. DSUF R; PRSUF R. This is a genuine dispute of material fact that weighs against granting summary judgment as it gets to how much Castro and Hewitt knew about the comments by the Home Depot employees. In either interpretation, though, the plain language of the email shows that Castro knew that Home Depot employees were making crazy and paranoid statements in response to being told that the Customer Service Representatives worked in Puerto Rico because she heard them for herself. Docket No. 103–1.

directed at Rivera is a question for the jury. *See Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 784 (10th Cir. 1995) (plaintiff "may, therefore, rely on US West's notice of any evidence of sexual harassment by Coleman that is similar in nature and near in time to his sexual harassment of Doi in order to raise a genuine issue of material fact as to whether US West knew or should have known of Coleman's conduct"); *Paroline v. Unisys Corp.,* 879 F.2d 100, 107 (4th Cir. 1989), *rev'd on other grounds,* 900 F.2d 27 (4th Cir. 1990) ("An employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct." (internal citation omitted)).

Hewitt repeatedly argues that it cannot be held liable for the Home Depot employees' alleged harassment of Rivera because Rivera did not report the conduct using Hewitt's anti-harassment policy and therefore "failed to put [Hewitt] on notice." Docket No. 107 at 16–18. Hewitt goes so far as to state, "[T]he uncontested evidence reveals that Rivera knew Hewitt's policies of zero tolerance . . . and she never complained under said policy. Therefore, Hewitt respectfully submits that this Honorable Court should summarily dismiss plaintiff's harassment claim." *Id*. at 18. However, this argument does not apply to instances of third-party harassment: none of the cases cited by Hewitt create a de facto rule that plaintiffs may not prove employer liability for third-party harassment if they did not use their employer's preferred reporting mechanisms. In fact, "[t]here is no requirement that a plaintiff must report the offensive conduct of co-workers to the employer to establish employer liability." *Theiss v. Walgreen Co.*, No. 16-CV-3318, 2017 WL 5709423, at *3 (6th Cir. Mar. 1, 2017) (internal quotation omitted); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) ("[T]he mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, [does not] insulate petitioner from liability."); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1180–81 (2d Cir. 1996) ("We know of no authority . . . to support . . . an alternative *per se* rule that the availability of a complaint procedure and an investigation of the complaint under that procedure, standing alone, requires us to reach the legal conclusion that the misconduct of a co-

worker cannot be imputed to the employer."); *Ramos-Santos v. Hernandez-Nogueras*, 867 F. Supp. 2d 235, 266–67 (D.P.R. 2012) (analyzing three different ways to establish employer liability: reporting the harassment, "the alleged incidents happen[ing] in the presence of a supervisor or other management-level employee[,]" and such "frequent, obvious, and pervasive" harassment that it "give[s] rise to a presumption that everyone" knew or should have known of it). Accordingly, Rivera's claims of harassment by third parties should not be precluded because she failed to use Hewitt's reporting system.

Hewitt's arguments regarding employer liability are more appropriate if Rivera alleged that a supervisor had harassed her as it is a defense to liability for supervisor harassment that—when there has been no "tangible employment action"—the employer "exercised reasonable care to prevent" sexual harassment and the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc.*, 422 F. Supp. 2d 336, 342 (D.P.R. 2006) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). Notwithstanding, nowhere in Rivera's responses to ARS and Hewitt's motions for summary judgment, sur-reply to Hewitt's motion for summary judgment or statement of facts does she allege that she endured a hostile work environment because of national origin-based harassment by a supervisor. Docket Nos. 116, 116–2, 117, 132. Thus, Hewitt's arguments regarding its reporting polices are not relevant here.

The last question under employer liability is, having found that there are sufficient facts to support the conclusion that Hewitt knew or should have known of the Home Depot employees' harassment of Rivera, whether Hewitt failed "to take immediate and corrective action." 29 C.F.R. § 1604.11(e). Notably, Hewitt never argues that it took immediate and corrective action, only that Rivera never reported the harassment. Docket No. 107 at 18. Consequently, the court should not grant summary judgment on Rivera's Title VII hostile work environment claim against Hewitt based on national origin discrimination.

## B.    Retaliation

Rivera v. Hewitt Associates Caribe, Inc., et al., Civil No. 15–1454 (PAD/BJM)                    20

Rivera also argues that she was subjected to retaliation because of her national origin. "A *prima facie* case of retaliation under Title VII must establish three elements: (1) that plaintiff engaged in a protected activity; (2) a materially adverse employment action that harmed the plaintiff inside or outside the workplace and that was harmful enough to dissuade a reasonable worker from making or supporting a charge of discrimination, and; (3) that the adverse action taken against the plaintiff was casually linked to his or her protected activity." *Saliceti-Valdespino*, No. 12-CV-1325 (GAG), at *10. Here, Rivera argues that she has met all three elements because she engaged in a protected activity when she complained to her supervisors about the harassment; she faced a materially adverse employment action when Hewitt allegedly papered her file with bad performance evaluations and terminated her employment; and the papering and termination occurred because of she complained to her supervisors about the national origin harassment. *See* Docket No. 117 at 21–22. Hewitt in turn argues that Rivera waived her right to raise a retaliation claim by failing to allege retaliation in her administrative charge before the Puerto Rico Department of Labor's Anti-Discrimination Unit ("ADU"). Hewitt also argues that Rivera cannot make a viable claim for retaliation because she cannot prove the third element of causation. Docket No. 127 at 7–8.

Hewitt failed to develop its argument that Rivera waived her right to raise a retaliation claim by failing to include it in her complaint to the ADU. It merely states that she did not include a retaliation claim and therefore it is time-barred. It also cites to *Ayala v. Shinseki* to support its position, but *Ayala* stands for the proposition that a plaintiff must bring a claim within 300 days of the discrete act of discrimination that she alleges was an unlawful employment practice. 780 F.3d 52, 58 (1st Cir. 2015). Hewitt does not allege that Rivera did not raise the allegedly unlawful employment practices—the papering of her file or termination—in her complaint to the ADU, so *Ayala* is not applicable. It is the law in this Circuit that legal arguments alluded to in a perfunctory manner but unaccompanied by a developed argumentation, are deemed abandoned. *U.S. v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990). Further, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for

the argument, and put flesh on its bones". *Id.* Therefore, the court should find that Hewitt abandoned this argument.

However, Hewitt challenged Rivera's retaliation claim on a second ground: that she cannot prove that the papering of her file or termination were related to her alleged grievances to her supervisors. Docket No. 127 at 8. Rivera alleges that she can show causation through the temporal proximity between her complaints to Ramos and Angel Rivera and the papering of her file and her termination. Docket No. 117 at 21.

The First Circuit has held that temporal proximity "may show the requisite causation, but only if that temporal proximity is very close." *Moreno-Rivera v. DHL Glob. Forwarding*, 762 F. Supp. 2d 397, 407 (D.P.R. 2011) (internal quotations omitted) (an adverse employment action occurring one month after the protected activity is sufficient temporal proximity (quoting *Calero-Cerezo v. U.S. Dept. of Justice,* 355 F.3d 6, 25 (1st Cir. 2004)). Rivera alleges that she first complained to Ramos about the harassing comments by Home Depot employees two or three weeks after August 19, 2013. PSUF ¶¶ 11, 17. Hewitt stated that Rivera's first evaluation, or as Rivera alleges, papering of her file, was conducted on September 17, 2013, just around two weeks after Rivera's first complaint.

Critically, Rivera's complaints to Ramos in August and September of 2013 do not qualify as protected conduct. Protected conduct "refers to action taken to protest or oppose statutorily prohibited discrimination." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (internal quotation marks omitted). Such protected conduct "includes 'the filing of formal charges of discrimination' as well as 'informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015) (quoting *Fantini*, 557 F.3d at 32). In essence, the employee must make her sentiments known to her employer or engage in actions with customers or the general public. Rivera's claim is that her comments to Ramos, as her supervisor, qualified as communicating with

Rivera v. Hewitt Associates Caribe, Inc., et al., Civil No. 15–1454 (PAD/BJM)                22

her employer. However, as Ramos did not represent Hewitt at the time in a supervisory capacity, Rivera's comments to her were not protected activity.[4] *See Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010) (an employee communicating to an employer her belief "that the employer has engaged in ... a form of employment discrimination" qualifies as opposition and therefore protected conduct). Furthermore, as Rivera admitted that she did not report any comments to Ramos after Ramos became her official supervisor, none of her comments to Ramos can qualify as protected activity. *See* DRSUF ¶ 16 ("On March 3, 2014, Livia Ramos became Rivera's supervisor; but as admitted by Rivera, at this point in time, she did not report any discrimination incidents to Ramos because she allegedly had done so before."). Because Angel Rivera was also not Rivera's supervisor, her comments to him do not qualify as protected activity either. Consequently, having taken no protected action, there can be no causation between it and the termination and alleged papering.

The court should accordingly dismiss Rivera's retaliation claims under Title VII.

## III.    ADEA

The ADEA "provides that it is unlawful for an employer to 'refuse to hire or to discharge any individual or otherwise discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of such . . . individual's age.'" *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 137–38 (1st Cir. 2012) (quoting 29 U.S.C. § 623(a)(1)). Broadly speaking, this statute "protects persons 40 years old or older from age-based employment discrimination." *Martinez-Rivera v. Commonwealth of P.R.*, 812 F.3d 69, 78 (1st Cir. 2016). The

---

[4] Although Rivera argues that Ramos was her supervisor at this time, Rivera has presented no evidence showing that Ramos could affect the terms and conditions of Rivera's employment such that she qualified as Rivera's supervisor. Docket No. 117 at 14. Merely stating that Ramos "performed the functions of Rivera's immediate supervisor" without any more specific evidence of how she controlled Rivera's employment is insufficient. *Id.*; DRSUF ¶ 16; *see Ahern*, 629 F.3d at 54 ("A nonmoving party must produce more than conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." (internal quotations omitted)). Similarly, Rivera's belief that Ramos was her supervisor is also insufficient to make Ramos her supervisor. *See Newell v. Celadon Sec. Servs., Inc.*, 417 F. Supp. 2d 85, 95–96 (D. Mass. 2006) (no employer liability where employee only made conclusory assertions that she believed Kouidri was her supervisor because the employee presented "no evidence that [she] believed Kouidri could significantly influence the terms and conditions of her employment or that Kouidri attempted to do so").

First Circuit has "recognized hostile work environment claims under the ADEA," *Collazo v. Nicholson*, 535 F.3d 41, 44 (1st Cir. 2008), as well as ADEA-based retaliation claims. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991). Rivera asserts that she was subjected to discriminatory adverse actions, retaliation, and harassment in violation of the ADEA.

### A.    Discrimination

To assert an ADEA discrimination claim, a plaintiff "has the burden of establishing 'that age was the "but-for" cause of the employer's adverse action.'" *Acevedo-Parrilla*, 696 F.3d at 138 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). This showing does not require the plaintiff "to proffer direct evidence of discrimination," as a plaintiff "may meet his burden through circumstantial evidence." *Acevedo-Parrilla*, 696 F.3d at 138. If the plaintiff can produce direct evidence, though, showing "that a proscribed factor [including age] . . . played a motivating part in the disputed employment decision" then "the burden of persuasion [shifts] to the employer, who then must establish that he would have reached the same decision regarding the plaintiff even if he had not taken the proscribed factor into account." *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989)); *Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 580 (1st Cir. 1999). Under the direct evidence test, "the plaintiff's initial burden under this 'mixed-motive' approach is heavier than the *de minimis* showing required to establish a prima facie case under the pretext approach." *Id.* (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997)); *see Patten v. Wal-Mart Stores E., Inc.*, 300 F.3d 21, 25 (1st Cir. 2002) ("The high threshold for this type of evidence requires that mere background noise and stray remarks be excluded from its definition." (internal quotations omitted)).

Direct evidence "normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30, 35 (1st Cir. 2001) (internal quotations omitted). Direct evidence is "relatively rare" because "[a] statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly

reflect illegal animus, and, thus, does not constitute direct evidence." *Patten*, 300 F.3d at 25. (internal quotations omitted). Courts have found that plaintiffs presented direct evidence when the person who makes the decision to terminate them directly comments on their protected identity in relation to their termination. *See Febres*, 214 F.3d at 59 (plaintiff presented direct evidence where an employer's criteria for an employment decision involved "job performance, union identification, and 'in some cases, the age'"); *LeMar v. W.H. Maze Co.*, 952 F. Supp. 2d 355, 356 (D. Mass. 2013) (plaintiff presented direct evidence when he was "told [he] was laid off, okay, until my back heals 100 percent, [that] they're giving me a chance to rest my back until my back heals 100 percent"). However, courts have found that even when the statements are made by the person who makes the decision to fire the plaintiff, the statements cannot qualify as direct evidence if they do not give a "'high degree of assurance' that a termination was attributable to discrimination." *Patten*, 300 F.3d at 25–26 (quoting *Fernandes*, 199 F.3d at 580) (the decisionmaker "mentioning . . . [plaintiff's] disability in the context of an adverse employment action" was not direct evidence where "management fully understood that appellant had a disability but could not further abide appellant's gross and repeated absenteeism").

Here, Rivera has not met the required threshold by producing direct evidence of age discrimination. Rivera alleges that on April 28, 2014, Carlos Lopez, Hewitt's Customer Services Manager, told a group of Hewitt employees during a meeting about the Home Depot account that what he wanted "was young, new blood, someone who would vigorously run with everything he wanted to introduce and all of the, the goals that he had set." Docket No. 101–2 at 176, 182; PSUF ¶ 25; APSUF ¶ 22. Unlike in *LeMar* where the statements were said during a meeting to discuss the plaintiff's job status and affirmed by the person who made the decision to fire the plaintiff, and the plaintiff was fired with no evidence that "the defendant had any problems with [the plaintiff's] attendance or job performance," here the statement was made during a meeting unrelated to Rivera's job status, was not affirmed by the two people who may have made the decision to fire Rivera, and there is evidence that Hewitt had problems with Rivera's job performance, particularly throughout the month of April. 952 F. Supp. 2d at 356–57; PRSUF ¶ Y (Ramos told Rivera on

April 1, 2014 that "they were going to put her on a personal improvement plan"); APSUF ¶ 18 (Rivera had three coaching sessions with Angel Rivera in April 2014). Furthermore, the statement about wanting "young, new blood" was not made to Rivera personally or in reference to Rivera but rather was made to a large group about a general goal for the future. The circumstances of the statement and the statement itself do not provide a "high degree of assurance" that the actual people who decided to fire Rivera made that decision in part based on her age. *Patten*, 300 F.3d at 25. Therefore, Rivera did not produce direct evidence of discrimination.

"Where, as here, the employee lacks direct evidence," courts "utilize the burden-shifting framework developed by the Supreme Court to facilitate the process of proving discrimination." *Cruz v. Bristol-Myers Squibb Co., P.R.*, 699 F.3d 563, 570 (1st Cir. 2012). This three-step burden-shifting framework was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

A prima facie case of age-based discrimination is established under the *McDonnell Douglas* burden-shifting framework by showing that (i) the employee "was at least 40; (ii) her work was sufficient to meet the employer's legitimate expectations; (iii) her employer took adverse action against her; and (iv) either younger persons were retained in the same position upon her termination or the employer did not treat age neutrally in taking the adverse action." *Del Valle-Santana v. Servicios Legales de P.R., Inc.*, 804 F.3d 127, 129–30 (1st Cir. 2015). "This showing gives rise to an inference that the employer discriminated due to the plaintiff's advanced years." *Mesnick*, 950 F.2d at 823.

After the plaintiff has shown a prima facie case of discrimination, the burden shifts to the defendant-employer to articulate "a legitimate, nondiscriminatory reason for the adverse employment decision." *Id.* "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." *Id.* If the employer satisfies this burden, "the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Gómez-González v. Rural*

*Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010) (internal quotation mark omitted). "At the summary judgment stage, the plaintiff need not prove his case, but must proffer sufficient evidence to raise a genuine issue of material fact as to whether he" suffered an adverse action "because of his age." *Adamson v. Walgreens Co.*, 750 F.3d 73, 78–79 (1st Cir. 2014) (citing *Domínguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)).

### 1.    *Age & Qualifications*

In this case, Hewitt concedes that Rivera was over 40 during the relevant events. APSUF ¶ 17. But Hewitt contends that Rivera failed to prove the second prong: that she met Hewitt's "legitimate expectations." A plaintiff's "burden under the 'qualified' prong of the prima facie case . . . is met if he presents 'evidence which, if believed, prove[s] that he was doing his chores proficiently.'" *Acevedo-Parrilla*, 696 F.3d at 139; *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988) ("qualifications" prong met notwithstanding "defendant's adamantine insistence that plaintiff's job performance was not up to snuff"). When evaluating whether the employee has met the employer's legitimate expectations, the court does not consider the employer's proffered reason for imposing the adverse employment action. *See Melendez v. Autogermana, Inc.*, 622 F.3d 46, 51 (1st Cir. 2010) ("we cannot rely on Meléndez's poor sales performance," which allegedly led to his dismissal, "in assessing whether he satisfied the legitimate expectations prong of the *prima facie* case").

Rivera began working for Hewitt in July 2013. PSUF ¶ 8. She underwent six weeks of training and then was assigned to exclusively work on the Home Depot Account. APSUF ¶ 20. When her six-month contract ended on January 29, 2014, she was offered a second contract that ran through March 31, 2014. APSUF ¶ 28. The new contract included a raise. APSUF ¶ 28. In March, Hewitt renewed Rivera's contract again through the end of April. DSUF ¶ X. There is a dispute between the parties as to Rivera's job performance between the beginning of her employment and the end of March. Rivera alleges that until March 25, 2014, she had never received a "coaching package," "evaluation" or "Personalized Care Guide." PSUF ¶ 22. She also never had a one-on-one coaching. PSUF ¶ 22. Hewitt argues that it continually gave her

evaluations and coaching packages during that period because her "performance was subpar." DSUF ¶¶ X, EE. Nonetheless, making all inferences in favor of Rivera, she has shown that a reasonable jury could find her work to have been proficient. Hewitt continued Rivera's employment after a lengthy training period and renewed her contract two times. It also allegedly never gave her any coaching sessions or negative evaluations for eight of the nine months that she was with Hewitt. Thus, a reasonable jury could find for Rivera as to the first two elements of her ADEA claim.

### 2.    *Adverse Employment Action*

To establish the third element of an ADEA discrimination claim, Rivera asserts that she was terminated. Docket No. 117 at 23. "An adverse employment action typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012) (internal quotation marks omitted). Hewitt does not contest that it fired Rivera or that her termination qualifies as an adverse employment action. *See, e.g.*, *Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d 17, 26 (1st Cir. 1998) ("There is no doubt that, at 54 years of age, Alvarez fell within the category of persons protected by the Act, and that he was subjected to adverse employment action, namely, suspension and termination."). Consequently, a reasonable jury could find for Rivera as to the third element of her ADEA claim.

### 3.    *Causation*

The final element of Rivera's prima facie case requires her to show that Hewitt retained younger people in the same position after she was terminated or that Hewitt "did not treat age neutrally in taking the adverse action." *Del Valle-Santana*, 804 F.3d at 129–30. Rivera alleges that Hewitt retained two younger people as Customer Service Representatives after she was terminated: Rosamarie Perea (age 31) and Gianfranco Prieto (age 24). Hewitt does not deny that it hired Perea and Prieto but argues that they did not replace Rivera because "the hiring process in the call center is continuous." DRSUF ¶ 28. Even so, the critical question is whether Hewitt, "had a continuing

need for the work that [Rivera] was performing prior to [her] termination." *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 449 (1st Cir. 2009). The fact that Hewitt continued hiring people as Customer Service Representatives is enough to make a prima facie showing that Hewitt had a continuing need for the work that Rivera was doing and hired younger people to do that work after terminating her. As such, Rivera has proffered sufficient evidence to establish a prima facie case of age-based discrimination arising from her termination.

### 4.    *Legitimate, Nondiscriminatory Reason & Pretext*

Hewitt contends that Rivera was terminated for a legitimate, nondiscriminatory reason: "Rivera's performance did not improve" and as such she failed "to accomplish the Company's goals." Docket No. 107 at 3. This is surely a legitimate, nondiscriminatory reason that satisfies Hewitt's burden of production. *See Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 28 (1st Cir. 1998) (employer's legitimate reason for firing employee was that when downsizing, it chose to fire plaintiff over others because of his poor performance). Hewitt having proffered a legitimate, nondiscriminatory reason for Rivera's termination, the spotlight returns to Rivera, who must show that this reason is a pretext for age-based discrimination.

In this third and final stage of the burden-shifting framework, "the *McDonnell Douglas* framework falls by the wayside," *Mesnick*, 950 F.2d at 824, and the court's focus turns to the "ultimate issue": whether, after assessing all the record evidence in the light most favorable to Rivera, she has raised a genuine dispute of material fact as to whether her termination was on account of discriminatory animus. *See Acevedo-Parrilla*, 696 F.3d at 140. To meet this burden, Rivera "must offer some *minimally sufficient* evidence, direct or indirect, both of pretext and of [Hewitt's] discriminatory animus." *Mesnick*, 950 F.2d at 825 (emphasis added); *see also Santiago–Ramos*, 217 F.3d at 54 ("courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent"). In making this showing, an employee may proffer the "same evidence" to "show both that the employer's articulated reason . . . is a pretext and that the true reason is discriminatory." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56–57 (1st Cir. 1999); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)

("Although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'") (internal citation omitted).

An employee may bring to the fore "comments by the employer which intimate a [discriminatory] mindset," *Mesnick*, 950 F.2d at 828, as well as "different and arguably inconsistent explanations" for the employer's actions. *Domínguez–Cruz*, 202 F.3d at 432. "'[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in the employer's proffered reason can also "do the trick." *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 93 (1st Cir. 2014) (quoting *Harrington v. Aggregate Indus.-Ne. Region, Inc.*, 668 F.3d 25, 33 (1st Cir .2012)). But pretext is not established by merely impugning the veracity of the employer's proffered reason or by showing that the employer's perception was incorrect. *See Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014) (to show pretext, it is insufficient for "a plaintiff to 'impugn the veracity' of the employer's proffered reason"); *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 177 (1st Cir. 2008) ("If there is no proof of discriminatory animus on the part of a decisionmaker, a plaintiff must show more than that the decisionmaker's perception was incorrect"); *Mesnick*, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits-or even rationality-of employers' nondiscriminatory business decisions.").

In this case, Rivera seeks to establish pretext by relying upon the same evidence she used to establish her prima facie case as well as the evidence of Carlos Lopez's statements regarding "young, new blood." *See Reeves*, 530 U.S. at 143; *Thomas*, 183 F.3d at 56–57. This evidence meets the "minimally sufficient evidence" standard because it would allow, though not necessarily compel, a reasonable jury to infer that Rivera's termination was driven by discriminatory animus and that the evaluations were not the actual reason for the suspension. *See Mesnick*, 950 F.2d at 825.

"[E]vidence of age-related comments could support an inference of pretext and discriminatory animus." *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000).

Here, Lopez, the Customer Services Group Manager, told the group of Customer Service Representatives that he "wanted young, new blood" and "young dynamic individuals." PSUF ¶ 25. Two days later, Hewitt did not renew Rivera's contract and terminated her employment. Lopez's role in Rivera's termination is contested, but Hewitt admitted that Lopez "had knowledge about plaintiff's performance while she was an employee at Hewitt, and that he counseled plaintiff about her performance problems." DRSUF ¶ 24. Lopez "had overall responsibility for Hewitt's San Juan Call Center." APSUF ¶ 22. Rivera was also one of the older Customer Service Representatives; the majority are under 40. A reasonable jury could use this evidence to find pretext, particularly given the close temporal proximity between the head of the call center calling for new blood and the firing of Rivera, one of its oldest employees on the Home Depot account.

Relying on the evidence above, Rivera seeks to survive summary judgment to tell the following narrative: that Rivera was a proficient employee, that Hewitt decided to have a younger workforce on its Home Depot account, and that Hewitt ousted Rivera, one of its oldest Customer Service Representatives working with Home Depot, on account of her advanced age. While Hewitt claims that its sole reason for terminating Rivera was her subpar job performance, Rivera has proffered enough evidence to raise a genuine dispute of material fact as to this issue. Summary judgment should be denied as to the ADEA discrimination claim arising from Rivera's termination.

### B.    Hostile Work Environment

The First Circuit has recognized the availability of hostile work environment claims arising under the ADEA. *Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 24 (1st Cir. 2001). Rivera's complaint included a claim of age-based harassment because of the comments of Angel Rivera. However, Rivera failed to raise any arguments to defend her claim in her reply to Hewitt's motion for summary judgment on the issue. As Rivera waived her claim, the court should grant summary judgment to Hewitt for Rivera's age-based hostile work environment claim.

### III.    State-Law Claims

Rivera has brought various claims under state-law counterparts to the federal antidiscrimination statutes, as well as a claim under the general tort statute of the Puerto Rico Civil

Code, Puerto Rico's breach of contract statutes, and Article II of the Puerto Rico Constitution. Specifically, she alleges violation of Law 100, Law 80, Law 379, Article 1802, Puerto Rico's Constitution, Art. II, §§ 1, 3, 8, 16, and Puerto Rico's breach of contract statutes. Compl. Hewitt has moved for summary judgment on all of Rivera's state-law claims. Rivera failed to respond to Hewitt's arguments regarding her claim under Law 379, Article 1802, and Puerto Rico's breach of contract statutes. As a consequence, Hewitt's motion for summary judgment on those three claims is unopposed and should be granted.

### A.    Law 100

Law 100, Puerto Rico's "general employment discrimination statute and Title VII's local counterpart, seeks to prevent discrimination in employment by reason of age, race, color, religion, sex social or national origin or social condition." *Godoy*, 747 F. Supp. 2d at 317–18 (Title VII and Law 100 are "essentially the same" except that "the Puerto Rico Supreme Court has recognized that it is more plaintiff-friendly than its federal counterpart" (internal citations omitted)). Age-based discrimination claims "asserted under the ADEA and Law 100 . . . are coterminous." *Gonzalez*, 304 F.3d at 73 n.7; *see Zayas-Ortiz v. Becton Dickinson Caribe, Ltd.*, 968 F. Supp. 2d 463, 474 (D.P.R. 2013) ("The analysis under the ADEA and Law 100 is practically the same."). Because summary judgment is unwarranted as to the Title VII and ADEA discrimination claims arising from Rivera's termination, summary judgment should also denied as to the Law 100 claim complaining of that same employment action.

Furthermore, Rivera has an even stronger claim under Law 100 than under the ADEA or Title VII because "Law 100 establishes a rebuttable presumption that the employer has discriminated illegally unless the employer can show that the discharge was justified." *Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 27 (1st Cir. 1998). When that presumption is triggered, "it shifts not only the burden of production, but also the burden of persuasion, from the employee to the employer." *Id*.; *see Cardona Jimenez v. Bancomerico de Puerto Rico*, 174 F.3d 36, 43 (1st Cir. 1999) (after plaintiff has alleged that she was discharged based on a discriminatory reason, "the burden shifts to the employer to prove by a preponderance

of the evidence that it had 'just cause' for its actions. If the employer establishes 'just cause,' the burden of proof returns to the plaintiff to show that the employer's decision was motivated by age discrimination" (internal citations omitted)). Hewitt has not shown by a preponderance of the evidence that Hewitt's desire for younger employees, as evinced by Lopez's comments about "new blood," did not impact its decision to terminate Rivera just two days after those comments were made to the Customer Service Representatives. Moreover, as Rivera has carried her burden of proof under Title VII, Hewitt has certainly not established by the preponderance of the evidence that Rivera was not subjected to a hostile work environment because of her national origin when Hewitt did not take corrective action after Home Depot employees allegedly made repeated denigrating comments to Rivera despite its supervisors knowing of the harassment.

### B.     Law 80

"Law 80 imposes a monetary penalty on employers who dismiss employees without just cause." *Otero-Burgos v. Inter Am. Univ.*, 558 F.3d 1, 7 (1st Cir. 2009). Under Law 80, a "discharge" includes "the employee's layoff." P.R. Laws Ann. tit., 29 § 185e. To make a Law 80 claim, "an employee bears the initial burden of alleging unjustified dismissal and proving actual dismissal. If the employee satisfies this burden, the employer must prove, by a preponderance of the evidence, that it discharged the employee for good cause." *Medina v. Adecco,* 561 F. Supp. 2d 162, 174 (D.P.R. 2008). As discussed above, it is uncontested that Rivera was laid off by Hewitt on April 30, 2014, so the question is whether that dismissal was without just cause. Based on Rivera's claims of national origin and age discrimination, Hewitt has not met its burden of proof to show that the dismissal was for good cause because "[t]riable issues remain regarding the real reason behind [Hewitt's] decision to terminate [Rivera's] assignment." *Id*. Moreover, Hewitt's sole argument in its motion for summary judgment regarding Rivera's Law 80 claim is that, "assuming arguendo that plaintiff can establish that she was unjustly terminated in violation of [Law 80,]" her recovery would be limited. Docket No. 107 at 23. As the size of Rivera's potential remedy is not the issue in front of the court at this moment, Hewitt has failed to even argue that there are no genuine issues of material fact such that summary judgment would be appropriate.

### C.    Constitutional Right to Privacy

"A claim for the invasion of privacy is actionable under Article II, Sect. 8, and Sect. 1, of the Constitution of the Commonwealth of Puerto Rico." *Dopp v. Fairfax Consultants, Ltd.*, 771 F. Supp. 494, 496 (D.P.R. 1990). In Puerto Rico, the right to privacy "operates *ex propio vigore* and an intrusion upon such right is actionable against state actors and private entities alike." *Corrada Betances v. Sea-Land Serv.*, No. 99-CV-1671, 2000 WL 33687211, at *5 (D.P.R. July 24, 2000), *aff'd sub nom. Corrada Betances v. Sea-Land Serv., Inc.*, 248 F.3d 40 (1st Cir. 2001) (citing *Colón v. Romero Barceló*, 112 P.R. Dec. 573 (1982)). The Puerto Rico Supreme Court's decision in *Arroyo v. Rattan Specialties* established "the breadth of these constitutionally protected rights, and the great importance [it] attached to them . . . : 'Interference with private life shall only be tolerated when compelling factors of public health and safety or when the affected person's right to life and happiness require it.'" *Kerr-Selgas v. Am. Airlines, Inc.*, 69 F.3d 1205, 1213 (1st Cir. 1995) (quoting *Arroyo v. Rattan Specialties,* 117 P.R.R. 43, 70 (1986)).

Therefore, to meet her burden of proof, Rivera "must present evidence of [Hewitt's] concrete actions that impinge upon [her] private or family life." *Rivera Rosa v. Citibank, N.A.*, 567 F. Supp. 2d 289, 302 (D.P.R. 2008) (internal quotations omitted). Hewitt's actions will not qualify as a constitutional violation if they did not "involve the 'indiscriminate dissemination of private or personal information,' did not 'unreasonably impinge[ ] on her personal or family tranquility,' did not 'disseminate false or slanderous information,' 'or limit [her] ability to make decisions about her private or family life.'" *Id*. (quoting *Segarra Hernandez v. Royal Bank de Puerto Rico*, 145 D.P.R. 178, 203 (1998)). Hewitt's actions are then "be examined by reference to the employer's particular business interests at stake." *Id*. Finally, "the individual's right to privacy will be balanced against the legitimate business interests that his or her employer is seeking to protect through the measures under attack." *Id*. (citing *Congreso de Uniones Industriales de Puerto Rico v. Bacardi Corp.*, 961 F. Supp. 338, 342 (D.P.R. 1997)).

Rivera first argues that the court should not consider Hewitt's arguments because it waived them by not raising them in its first motion for summary judgment. As the court already considered

and rejected that argument, I will consider Hewitt's arguments on the merits. *See* Docket No. 125 ("Having considered defendants' response at Docket No. 123, plaintiff's request to strike is denied.").

Here, it is uncontested that after Hewitt decided to terminate Rivera, Rivera and Hewitt's human resources staff met in Hewitt's conference room to carry out her termination process. APSUF ¶ 33. While Rivera was in the conference room, Hewitt's employees opened the drawers of Rivera's desk, removed her purse, opened it, and transferred Rivera's personal items from her desk to her purse. DRSUF ¶ 27. They then brought the purse to Rivera. DRSUF ¶ 27. Rivera alleges that the search was done without her consent, which Hewitt does not specifically deny. PSUF ¶ 27; DRSUF ¶ 27. Rivera also alleges that her desk drawers had personal items including female urinary incontinency pads. PSUF ¶ 27. Although Hewitt points out that Rivera stated in her interrogatory that they were female pads whereas she stated in the statement of uncontested facts that they were female urinary incontinency pads, these two statements are not mutually exclusive, and the inconsistency does not lessen the credibility of Rivera's allegation. *See* DRSUF ¶ 27.

Going through Rivera's purse qualifies as a concrete action. Unlike in *Corrada Betances* where the plaintiff argued that his right to privacy was violated because his employer said that it fired the plaintiff because of his "alcohol consumption" and "corporate policy violations" without providing evidence of those infractions to the plaintiff, here Rivera has identified a particular and tangible action taken by Hewitt—searching through her purse and desk without her permission. *See Corrada Betances v. Sea-Land Serv.*, No. 99-CV-1671, at *5.

Rivera did not allege that Hewitt disseminated her information or disseminated false information about her. She similarly did not allege that Hewitt limited her ability to make any decisions about her private or family life. Consequently, Rivera must show that Hewitt impinged on her personal tranquility, but it is not clear that Hewitt's actions in fact did so. Rivera places special emphasis on the fact that she had a "reasonable expectation of privacy for items inside her purse," apparently conceding that she did not have a privacy interest in the drawers of her desk. Docket No. 117 at 24. All of the personal items that Rivera mentions, though, such as her female

urinary incontinency pads, financial documents, and her wallet, were in the desk drawer rather than in her purse.[5] Therefore, Rivera has presented no evidence that the contents of her purse were personal, or even that the purse had anything left in it after she removed her "cellular, cigarette carrier and lighter, car keys, wallet, lipstick, pressed powder and female pads . . . [and] a hard cover folder with personal documents (bank statements, collection letters, personal notes, etc.)" and placed them in the desk drawers. DRSUF ¶ 27. Instead, she relies on the general presumption that the fact that she used a particular bag as a purse made it so inherently personal that Hewitt's employees opening it was a violation of her privacy. Rivera provides no cases finding that a person has a privacy interest in a particular bag as a matter of law, and I was not able to find any.

Hewitt justifies its actions by arguing that the search and retrieval of Rivera's purse was "inherent to the termination process." In the Puerto Rico Supreme Court case, *Irizarry v. Caribbean Restaurants, LLC*, after the plaintiff was fired, he was told to pack up his own things, and then escorted out of the building. DKDP2003–0438 (TSPR Dec. 13, 2010);[6] Docket No. 85–1 at 42. The employee alleged that he was not given enough time to pack up his things, which was contested by the employer, and that the act of being escorted off the property was humiliating and therefore violated his right to privacy. *Id*. The court found that Irizarry's right of privacy had not been violated because being "escorted off the premises was justified and reasonable" given the circumstances. *Id*. at 53. There are some notable differences between the case at hand and *Irizarry* including the fact that the employee in *Irizarry* was allowed to gather his things himself and that he was an employee with sensitive information being escorted through an area that was "strictly controlled for security reasons." *Id*. at 44. The court explained that these "specific circumstances" particularly justified the manner in which the employer conducted the termination process. *Id*.

---

[5] As it is written, it is unclear from Rivera's statement of uncontested facts whether the office desk drawers or the purse had personal items in it: "Defendants' employees opened and search both Rivera's office desk drawers and her pursue [sic], which contained personal items, such as female urinary incontinency pads, without her consent." PSUF 27. However, Rivera's statement in her response to Hewitt's interrogatories makes clear that she had removed the pads and other personal items, such as her wallet and a folder of financial documents, from her purse and placed them in the desk drawers. DRSUF 27.

[6] Although unpublished, Hewitt provided an English translation of the case at Docket No. 85–1.

Here, neither party has argued that Hewitt required heightened security protocol or that Rivera had any of Hewitt's sensitive information. Therefore, Hewitt's business interest must be understood to be merely ensuring a smooth transition after terminating an employee, but it is unclear how, if at all, Hewitt's business interests were furthered by refusing to allow Rivera to gather her own things. However, the law only requires that an employer may "not to infringe its employees' zone of individual autonomy that the right of privacy protects," and Rivera cannot point to any material facts that support a finding that her zone of individual autonomy includes her purse without any details as to what, if anything, made it private. Thus, the court should grant summary judgment on Rivera's right of privacy claims in favor of Hewitt.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment should be **GRANTED IN PART AND DENIED IN PART**. The Title VII hostile work environment, ADEA discrimination, Law 100, and Law 80 claims arising from Rivera's employment with and termination by Hewitt on April 30, 2014 should survive summary judgment. The Title VII retaliation, ADEA hostile work environment, Law 379, Article 1802, right of privacy under the Puerto Rico Constitution, and breach of contract claims should be **DISMISSED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas* v. *Arn*, 474 U.S. 140, 155 (1985); *Davet* v. *Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co.* v. *Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden* v. *Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 20th day of February 2018.

*S/ Bruce J. McGiverin*

BRUCE J. McGIVERIN
United States Magistrate Judge